**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. _______________** |
| **v.** | : | **DATE FILED: _________________** |
| **JAMES D. FALKOWSKI a/k/a "Jamie Falkowski"** | : | **VIOLATIONS:** **18 U.S.C. § 1343 (wire fraud - 11 counts)** |
| | : | **18 U.S.C. § 1341 (mail fraud - 11 counts)** **18 U.S.C. § 371 (conspiracy - 1 count)** |
| | : | **Notice of Forfeiture** |

**INDICTMENT**

**COUNTS ONE THROUGH ELEVEN**
**(Wire Fraud)**

**THE GRAND JURY CHARGES THAT:**

At all times relevant to this indictment:

**BACKGROUND**

1. QVC, Inc. ("QVC") was an American cable, satellite and broadcast television network and multinational corporation specializing in televised home shopping, engaged in interstate and foreign commerce. Founded in 1986, QVC reached millions of customers around the world via television stations in various countries, including the United States, Great Britain, Germany, and Japan, as well as through the internet and social media. QVC's headquarters were located in West Chester, Pennsylvania, within the Eastern District of Pennsylvania.

2. Defendant JAMES D. FALKOWSKI, a/k/a "Jamie Falkowski," a resident of Philadelphia, was a director in QVC's marketing department from November 10, 2008,

through his termination on December 5, 2013, at QVC's offices in West Chester, Pennsylvania. Defendant FALKOWSKI was responsible for developing and enhancing QVC's brand through event-driven marketing events, the primary focus being to elevate QVC's presence and reputation in the entertainment and fashion industries. Defendant FALKOWSKI earned from QVC, in salary and bonus, at least approximately $238,800 per year at or about the time of his termination.

3. The Steinberg Group, Inc., d/b/a "dOMAIN", d/b/a "Domain Miami LLC" ("TSG"), was a public relations agency based in Los Angeles, California.

4. TSG was managed by its President, M.S.

5. E.W. was TSG's General Counsel and Business Affairs Manager. E.W. also was the husband of TSG's President M.S, and was an attorney licensed to practice law in Florida.

6. SPEC Entertainment, d/b/a "CS Global" ("SPEC") was a production management company based in New York City, NY. SPEC was managed by its President ("SPEC's President"), a person known to the grand jury.

7. Bank of the West, JP Morgan Chase Bank, and Bank of America were financial institutions engaged in interstate commerce, the deposits of which were insured by the Federal Deposit Insurance Corporation.

8. The United Parcel Service ("UPS") was an international package delivery company, operating in interstate commerce, which delivered millions of packages each day to recipients located across the United States and around the world.

**THE SCHEME**

1. From at least in or about November 2008 through at least in or about May 2016, defendant

**JAMES D. FALKOWSKI**
**a/k/a "Jamie Falkowski"**

devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

**MANNER AND MEANS**

It was part of the scheme that:

2. Defendant JAMES D. FALKOWSKI engaged in a multi-layered fraud scheme that enabled him to live a life of luxury. Defendant FALKOWSKI deployed a variety of methods to fraudulently obtain at least over $1,000,000 worth of money, goods and services from his employer, QVC.

3. Defendant JAMES D. FALKOWSKI maintained a personal relationship with TSG's President, M.S., predating his time at QVC. When defendant FALKOWSKI was hired by QVC in fall 2008, he "brought" M.S. and her company TSG with him, causing QVC to hire TSG to serve as an outside public-relations arm.

4. Initially, QVC paid TSG on a per-project basis, which defendant JAMES D. FALKOWSKI had converted into a monthly retainer from QVC totaling $8,500. Soon thereafter, defendant FALKOWSKI caused QVC to increase TSG's monthly retainer to $11,000.

5. TSG was responsible for public relations and event-planning for QVC's events, including booking celebrity appearances, managing event production, and operating event logistics.

6. Because QVC paid TSG a monthly retainer, TSG was not permitted to "upcharge" QVC for expenses – meaning TSG could only charge QVC for the actual dollar amount TSG incurred on QVC's behalf, and no more. TSG later sought reimbursement for such expenses by issuing itemized invoices to QVC explaining each expense in a line item, thereby permitting QVC to review and approve all expenses prior to issuing reimbursement.

7. Defendant JAMES D. FALKOWSKI controlled QVC's relationship with TSG, and TSG generally submitted its invoices directly to defendant FALKOWSKI, who in turn submitted them on for approval and payment to his superiors and/or to QVC's accounts payable department. This meant that defendant FALKOWSKI was in a position to cause TSG's invoices to be fraudulently altered prior to their submission to QVC's accounts payable department.

8. QVC was one of TSG's biggest clients, and one of its most important. TSG depended on QVC's business and monthly retainer checks to stay afloat.

**The Fraud**

9. Defendant JAMES D. FALKOWSKI used TSG to "launder" hundreds of thousands of dollars of his personal expenses. Defendant FALKOWSKI did this by having TSG reimburse him for his personal expenses, and then bill QVC for those personal expenses by disguising the costs as legitimate reimbursement expenses of TSG. Defendant FALKOWSKI also had TSG reimburse him for many expenses he had already submitted to QVC for direct reimbursement. Defendant FALKOWSKI also caused TSG to pay his credit card bills and personal vendors for various personal expenses, to book over $200,000 in private luxury chauffeur services for himself and his friends and associates, and to purchase thousands of dollars' of pre-paid gift cards for his personal use, among other methods of defrauding QVC.

10. M.S. and E.W. had incentive to keep defendant JAMES D. FALKOWSKI happy, lest they risk defendant FALKOWSKI causing QVC to fire TSG. In order to keep their contract with QVC, M.S. and E.W. participated in certain aspects of defendant FALKOWSKI's fraud, and knew about but did not stop other aspects of defendant FALKOWSKI's fraud.

11. Defendant JAMES D. FALKOWSKI also engaged in a fraudulent kickback arrangement with E.W. and M.S., pursuant to which he instructed E.W. and M.S. how to earn money via a royalty deal with QVC and provided them with QVC's inside contractual information to enable them to negotiate against QVC for more money over a longer time period. In return, defendant FALKOWSKI was secretly cut into the deal in the form of a monetary kickback. Defendant FALKOWSKI, E.W. and M.S. also entered into a kickback arrangement for a deal involving products sold by a QVC competitor.

12. Defendant JAMES D. FALKOWSKI also caused QVC vendor SPEC to participate in his fraud scheme. Defendant FALKOWSKI's personal friend was the President and CEO of SPEC; defendant FALKOWSKI caused QVC to hire SPEC to assist with major event production. QVC ultimately paid SPEC millions of dollars for its work.

13. As with E.W. and M.S., defendant JAMES D. FALKOWSKI engaged in a fraudulent kickback arrangement with SPEC's President, pursuant to which defendant FALKOWSKI instructed SPEC's President how to earn money via a royalty deal with QVC, and in return, defendant FALKOWSKI was secretly cut into the deal in the form of a monetary kickback.

14. Defendant JAMES D. FALKOWSKI also caused SPEC to fraudulently alter invoices submitted to QVC to hide the true nature of certain expenses, including defendant

FALKOWSKI's excessive expenses at luxury hotels that SPEC had incurred on QVC's behalf, and to cover a personal vacation to Turks and Caicos.

15. Specifically, defendant JAMES D. FALKOWSKI used the following methods to defraud QVC:

**Expense Laundering**

16. Defendant JAMES D. FALKOWSKI knew that, as a QVC employee, he was required to submit expenses he incurred for legitimate QVC purposes directly to QVC for reimbursement. This he did: from in or about 2008 through in or about 2013, defendant FALKOWSKI submitted to QVC, and was reimbursed by QVC, for expenses he incurred totaling approximately $533,642.04.

17. Defendant JAMES D. FALKOWSKI also used a fraudulent "back door" to cover various expenses: he submitted various expenses to TSG, many of them personal in nature, ordered TSG to repay him directly, and then instructed TSG to write fraudulent invoices when obtaining reimbursement from QVC. Those invoices intentionally failed to disclose to QVC that these were defendant FALKOWSKI's expenses, and did not disclose the true nature of defendant FALKOWSKI's expenses.

18. Defendant JAMES D. FALKOWSKI used this "expense laundering" method to finance a lifestyle of luxury, causing TSG to pay him for – and QVC ultimately to repay TSG for – his high-end clothing and accessories, luxury hotel and resort stays, spa treatments, restaurants, travel and the like, including: Botox treatment at dermatologist Dr. M.R.B.'s offices in New York City, NY; airfare for flights to and from his hometown of Buffalo, New York, airfare for his personal vacation in Europe in 2012, airfare for flights in 2011 from

Turks and Caicos to Seattle, WA to attend a New Year's Eve party at his friend M.B.'s parents' home, and for various flights that were purchased by QVC's in-house travel department; for thousands of dollars of spa treatments at Four Seasons Hotels in New York City and Los Angeles; and for luxury hotel and resort stays for defendant FALKOWSKI, his friend C.S., and his personal assistant F.E.

19. After incurring these expenses – and sometimes, even before he incurred any expenses at all – defendant JAMES D. FALKOWSKI commanded TSG's bookkeeper J.S. to pay him directly, which TSG did either by issuing defendant FALKOWSKI a check or wire transfer.

20. TSG subsequently obtained reimbursement from QVC by issuing fraudulent invoices often written at defendant JAMES D. FALKOWSKI's direction and, in certain instances, written by defendant FALKOWSKI himself. Those fraudulent invoices, by design, did not reveal to QVC the true nature of the expenses on the invoices.

21. In some instances, defendant JAMES D. FALKOWSKI provided receipts to TSG to justify the funds he commanded TSG to pay him directly. But in other instances, defendant FALKOWSKI chose not to provide receipts to TSG to justify TSG's payments to him.

22. In instances when defendant JAMES D. FALKOWSKI chose not to provide TSG with receipts to justify TSG's payments to him, TSG classified such payments as income to defendant FALKOWSKI, paying him as a consultant. For instance, in an email sent by J.S. to defendant FALKOWSKI on or about July 23, 2012, J.S. stated: "[T]he Steinberg Group has paid you the following fees (will be taxed): 2/14/12 James Falkowski $16,280[;] 3/9/12 James Falkowski $42,000.00."

23. In total, from on or about June 10, 2009, through on or about August 1, 2014, TSG paid defendant JAMES D. FALKOWSKI, at his command and direction, approximately $535,993.33 as reimbursement for his purported expenses – whether or not defendant FALKOWSKI provided any supporting receipts – either by issuing a check or a wire transfer.

24. TSG's leadership knew that paying defendant JAMES D. FALKOWSKI's expenses was problematic, but continued to do so nonetheless.

25. For instance, on or about June 20, 2011, after J.S. notified E.W. via email that TSG paid for a nearly $9,000 Four Seasons hotel bill for defendant JAMES D. FALKOWSKI, E.W. responded by email, stating: "You know, sooner or later this is going to hurt us. [. . .] Im not sure anyone is thinking long term."

26. In an email dated on or about August 2, 2013, E.W. warned M.S.: "We can't make payroll because of HIS [defendant JAMES D. FALKOWSKI's] person[al] expenses he is having trouble covering. That's not part of our deal and he is taking advantage." Later that day, E.W. emailed defendant FALKOWSKI, stating: "We cant take the regular route for payment by Q because of the nature of the charges. So our hands are tied on getting paid. You know this. Its been going on for several months." On or about August 21, 2013, E.W. emailed defendant FALKOWSKI, stating: "We r all in this together. Our bottom line is yours."

27. After QVC terminated defendant JAMES D. FALKOWSKI in December 2013, TSG had on its books approximately $70,000 of expenses incurred on defendant FALKOWSKI's behalf, but not yet submitted to QVC for reimbursement to QVC – including

over $44,000 for defendant FALKOWSKI's private luxury chauffeur services, over $6,000 in "gifts" for defendant FALKOWSKI, and thousands of dollars of credit card interest.

28. On or about January 24, 2014, J.S. emailed E.W. recommending that TSG not seek reimbursement from QVC for the "gifts" when submitting the remaining expenses: "I would say not to include the gifts. I think it opens a pandoras box," to which E.W. responded via email: "Fyi we can NOT mention interest. If it were a normal business expense, and we were owed the money, we would have brought it to [QVC]'s attention WAY before charging interest. That will raise an eyebrow for sure."

29. On or about April 24, 2014, E.W. emailed defendant JAMES D. FALKOWSKI, stating: "The outstanding debt belongs to everyone [. . . .] Especially because you personally incurred [the debt] for your own benefit."

**"Double Dipping" Method**

30. Defendant JAMES D. FALKOWSKI repeatedly submitted the same expenses for reimbursement multiple times: first to QVC, which repaid him for permissible expenses, and again to TSG, which also paid defendant FALKOWSKI whatever dollar amounts defendant FALKOWSKI commanded. TSG subsequently obtained reimbursement from QVC by issuing fraudulent invoices often written at defendant FALKOWSKI's direction and, in some instances, written by defendant FALKOWSKI himself. Those invoices, by design, did not inform of QVC the true nature of the expenses.

31. In some instances, defendant JAMES D. FALKOWSKI created fake invoices, hotel room folios, and bills for submission to QVC to hide the true costs of his expenses when obtaining direct reimbursement, but also submitted the genuine, more expensive

bill to TSG for reimbursement – for which TSG was thereafter reimbursed by QVC. Examples of this double dipping method were as follows:

a. On expense form JF051010, defendant FALKOWSKI submitted to QVC a $2,151.71 Four Seasons Los Angeles at Beverly Hills bill for his stay from May 6, 2010 through May 10, 2010, which included hundreds of dollars of spa services. FALKOWSKI was reimbursed by QVC accordingly. He also submitted the same receipt to TSG, and was reimbursed by TSG.

b. On expense form JF03111, defendant FALKOWSKI submitted to QVC a $2,958.67 "Parker Palm Spring Resort" bill for his stay from March 2, 2011, through March 5, 2011. Defendant FALKOWSKI was reimbursed by QVC accordingly. He also submitted the same receipt to TSG, and was reimbursed by TSG.

c. On expense form JF061211B, defendant FALKOWSKI submitted to QVC a $3,753.69 "Viceroy Snowmass Colorado Resort" bill for his stay from June 12, 2011 through June 21, 2011. Defendant FALKOWSKI was reimbursed by QVC accordingly. He also submitted the same receipt to TSG, and was reimbursed by TSG.

d. On expense form JF051220121, defendant FALKOWSKI submitted to QVC a $6,594 "St. Regis Aspen Resort" bill for his stay from June 12, 2012 through June 18, 2012. FALKOWSKI was reimbursed by QVC accordingly. He also submitted the same receipt to TSG, and was reimbursed by TSG.

e. On expense form JF07292012, defendant FALKOWSKI submitted to QVC a $1,784.34 Trump Soho New York hotel bill for his stay from July 29, 2012 through July 30, 2012. Defendant FALKOWSKI was reimbursed by QVC accordingly. He also submitted the

same receipt for reimbursement three separate times to TSG. Thus, defendant FALKOWSKI was reimbursed four separate times for this expense – once by QVC, and three times by TSG.

f. On expense form JF10112012, defendant FALKOWSKI submitted to QVC a fake hotel bill he created purporting to be a $7,706.79 stay at the Four Seasons Los Angeles at Beverly Hills from October 11, 2012 through October 21, 2012. Defendant FALKOWSKI was reimbursed by QVC accordingly. Defendant FALKOWSKI also submitted the genuine Four Seasons bill, which actually cost $9,731.82, to TSG, and was reimbursed by TSG for the genuine hotel bill's cost. Thus, defendant FALKOWSKI was reimbursed twice: once by QVC for the fake, cheaper bill, and again by TSG for the genuine, more-expensive hotel bill.

g. On expense form JF02162013, defendant FALKOWSKI submitted to QVC a fake hotel bill he created purporting to be a $6,648.26 stay at the Four Seasons Los Angeles at Beverly Hills from February 16, 2013, through February 28, 2013. In reality, defendant FALKOWSKI stayed at the hotel from February 16, 2013, through March 6, 2013, at a cost of $13,693.52, the genuine bill including personal spa services, cabana restaurant meals, room service, and private bar bills. Defendant FALKOWSKI also caused QVC vendor SPEC to submit the genuine Four Seasons bill to QVC for reimbursement, and QVC reimbursed SPEC for the genuine hotel bill.

**<u>Vendor/Creditor Direct Payments</u>**

32. Defendant JAMES D. FALKOWSKI repeatedly ordered TSG to pay his vendors or creditors directly. TSG subsequently obtained reimbursement from QVC by issuing fraudulent invoices often written at defendant FALKOWSKI's direction and, in some instances,

written by defendant FALKOWSKI himself. Those invoices, by design, did not inform of QVC the true nature of the expenses.

33. On or about on October 21, 2011, at defendant JAMES D. FALKOWSKI's instruction, TSG paid defendant FALKOWSKI's American Express bill totaling $38,012.51 by issuing a check to American Express, but when submitting and receiving reimbursement from QVC, TSG's fraudulent invoice did not inform QVC of the true nature of the charges.

34. From on or about March 11, 2011, through on or about September 9, 2011, defendant JAMES D. FALKOWSKI ordered TSG to pay approximately $28,705 to custom furniture maker "Christian Vincent" for a custom-built credenza table costing $17,880, and a custom-built coffee table costing $10,825. These custom tables were ordered and designed by defendant FALKOWSKI specifically for his apartment in Philadelphia, PA, and were delivered and installed by the maker into defendant FALKOWSKI's apartment.

35. Defendant JAMES D. FALKOWSKI subsequently created fake invoices purporting to be from Christian Vincent that included the company's logo, unique font and design style. In those invoices, defendant FALKOWSKI wrote bogus project scopes to make it appear that his custom furniture was for QVC-related events in Los Angeles and New York City. Defendant FALKOWSKI thereafter submitted his fake invoices to TSG, and ordered TSG's bookkeeper, J.S., to pay Christian Vincent directly. As a result, TSG paid Christian Vincent $28,705 for defendant FALKOWSKI's coffee table and credenza. When submitting and receiving reimbursement from QVC for these charges, TSG's fraudulent invoice did not inform QVC of the true nature of the charges.

36. On or about July 18, 2012, defendant JAMES D. FALKOWSKI caused TSG to pay a hotel bill for $1,071.60 for defendant FALKOWSKI's personal assistant F.E.'s stay at the "SeaCrest on the Ocean" hotel. On or about August 17, 2012, at defendant JAMES D. FALKOWSKI's direction, TSG issued a $3,000 payment to defendant FALKOWSKI's personal assistant F.E. In both instances, when subsequently billing and receiving repayment from QVC, TSG's fraudulent invoice did not inform QVC of the true nature of the charges.

**Invoice Alteration**

37. Defendant JAMES D. FALKOWSKI caused SPEC to fraudulently alter itemized invoices SPEC submitted to QVC to hide the true nature of defendant FALKOWSKI's expenses, including by drastically reducing the true costs of defendant FALKOWSKI's luxury hotel stays at the Four Seasons to hide these costs from QVC, and by inflating an event invoice to cover defendant FALKOWSKI's and SPEC's President's personal vacation to the Turks and Caicos Islands.

38. In Spring 2010, SPEC submitted to defendant JAMES D. FALKOWSKI for his review a draft invoice reflecting a $12,500 charge to QVC for SPEC's work on QVC's 2010 "Fashion for Haiti" event to support recovery efforts for victims of Haiti's earthquakes.

39. Defendant JAMES D. FALKOWSKI instructed SPEC's President to falsify the "QVC Fashion for Haiti" invoice by adding an additional $5,000, to cover the cost of defendant FALKOWSKI's and SPEC's President's personal vacation to the Turks and Caicos to celebrate defendant FALKOWSKI's birthday. SPEC's President did as defendant FALKOWSKI instructed, and SPEC submitted to QVC the fraudulently-altered invoice totaling $17,500. QVC ultimately reimbursed SPEC for the falsified amount.

40. For the 2012 Oscars in Los Angeles, Defendant FALKOWSKI knew that SPEC was responsible for paying the hotel and incidentals bills for all QVC employees at the Four Seasons Los Angeles at Beverly Hills, and that SPEC ultimately would submit an invoice to QVC seeking reimbursement for such charges.

41. From February 18, 2012, through March 1, 2012, defendant JAMES D. FALKOWSKI personally incurred a $42,484.99 Four Seasons bill: his luxury suite cost $18,934.46, and his incidental fees were $23,550.53, which included thousands of dollars of spa treatments for himself and his associates.

42. After SPEC sent defendant JAMES D. FALKOWSKI a draft invoice of the full event bill for his review prior to submission to QVC, defendant FALKOWSKI provided written instructions to SPEC to falsify the invoice by altering defendant FALKOWSKI's hotel bill and incidentals costs, and inflating other costs to make up the difference.

43. SPEC's final invoice submitted to QVC falsified defendant JAMES D. FALKOWSKI's expenses as follows: defendant FALKOWSKI's room bill of $18,934.46 was reduced to $10,195.48, and his incidentals bill of $23,550.53 was reduced to $7,028.72. SPEC made up for these reductions by inflating other charges on its invoice, including by adding bogus charges to the hotel bills for celebrities J.R. and N.R. QVC subsequently paid SPEC's bill without knowing the truth about defendant FALKOWSKI's and SPEC's fraud.

44. The next year, for the 2013 Oscars, defendant JAMES D. FALKOWSKI again stayed at the Four Seasons Los Angeles at Beverly Hills, where he incurred a $46,184.48 bill during his stay: his luxury suite cost $32,250.96, and his incidentals fees were $13,693.52.

45. After SPEC sent defendant JAMES D. FALKOWSKI a draft invoice of the full event bill for his review prior to submission to QVC, defendant FALKOWSKI instructed SPEC to falsify the invoice by altering defendant FALKOWSKI's hotel bill and incidentals costs, and inflate other costs to make up the difference.

46. SPEC's final invoice submitted to QVC falsified defendant JAMES D. FALKOWSKI's expenses as follows: defendant FALKOWSKI's room bill of $32,250.96 was reduced to $7,005.12, and defendant FALKOWSKI's incidentals bill of $13,693.52 was reduced to $0.00.

47. SPEC made up for the reductions by inflating other charges on its invoice, including by adding bogus charges to the "green room incidentals" fees for celebrities H.K. and J.H. QVC subsequently paid the bill without knowing the truth about defendant FALKOWSKI's and SPEC's fraud.

**Gift Card Fraud**

48. Defendant JAMES D. FALKOWSKI instructed QVC vendors to purchase tens of thousands of dollars' worth of pre-paid gift cards under the false pretense that the cards were for defendant FALKOWSKI to distribute to celebrities or "talent."

49. In reality, defendant JAMES D. FALKOWSKI kept and spent the gift cards himself for a variety of purchases, including high-end clothing, restaurants, pet stores, food markets, dry cleaning, gasoline, and movie tickets.

50. After purchasing the gift cards and providing them to defendant JAMES D. FALKOWSKI, the vendors thereafter sought and received reimbursement from QVC for the

gift cards. In no instance was QVC aware that defendant JAMES D. FALKOWSKI kept and spent the gift cards himself.

51. All told, defendant JAMES D. FALKOWSKI fraudulently obtained and spent at least approximately $59,500 in pre-paid gift cards, including $30,000 in pre-paid American Express gift cards; $24,000 in pre-paid Tom Ford gift cards; and $5,500 in pre-paid Barney's New York gift cards.

52. In some instances, defendant JAMES D. FALKOWSKI submitted receipts for purchases he made using the pre-paid gift cards to TSG for direct reimbursement, causing TSG to pay defendant FALKOWSKI for expenses he had not actually incurred. TSG thereafter issued a fraudulent invoice to QVC to obtain reimbursement for these expenses – which QVC had already paid at the outset.

**Fraudulent Use of Private Luxury Chauffeur Services**

53. From in or about December 2009 through in or about November 2013, defendant JAMES D. FALKOWSKI booked on TSG's accounts, or caused TSG to book, private luxury chauffeur services for defendant FALKOWSKI, and for his friends and associates. TSG thereafter sought and received reimbursement from QVC by issuing fraudulent invoices that, by design, did not inform QVC of the true nature of defendant FALKOWSKI's, and his friends' and associates', private luxury chauffeur expenses.

54. In total, defendant JAMES D. FALKOWSKI caused TSG to spend approximately $225,735.41 in luxury chauffeur services as follows: on TSG's EmpireCLS account, at least approximately $192,735.41; on TSG's Elite Transportation account, at least

approximately $30,000; and on TSG's Beverly Hills Rides account, at least approximately $3,000.

55. In some instances, defendant JAMES D. FALKOWSKI made fake invoices purporting to be from the transportation companies, and in other instances, defendant FALKOWSKI instructed TSG to alter genuine invoices provided by the transportation companies to make it appear to QVC that defendant FALKOWSKI's luxury car rides were legitimate. For instance:

a. Elite Transportation's genuine invoice dated September 24, 2011, costing $1,260, stated that defendant FALKOWSKI was to be picked up at 10:00 a.m. at New York's Penn Station and proceed "as directed." Defendant FALKOWSKI used that private car for 14 hours. However, in an email to TSG's bookkeeper J.S. dated January 29, 2012, defendant FALKOWSKI instructed J.S. to alter the invoice by adding a phantom second car ride into the invoice, adding the name "Lori Goldstein" as the rider of the phantom car, and to write that Lori Goldstein's phantom ride was to her "Private residence and as directed."

b. Defendant FALKOWSKI created a fake EmpireCLS invoice, purporting to be dated November 14, 2012, costing $432.01, with a trip itinerary of: "Pickup Ms. Goldstein at PRIVATE HOME and drop off at NY PENN STATION." No such ride occurred. Defendant FALKOWSKI created this bogus invoice, and caused this invoice to be submitted to QVC in an effort to defray the cost of other rides.

56. Defendant JAMES D. FALKOWSKI used luxury private chauffeur services for rides that were personal in nature. For example, in or about June 2012 and July 2012, defendant FALKOWSKI took private luxury chauffeur rides to and from his apartment in

Philadelphia, PA and the Newark International Airport, to catch, and be picked up from, flights for his personal vacation to Europe.

57. Defendant JAMES D. FALKOWSKI also caused TSG to pay for luxury private chauffeur rides for his friends, romantic interests, and associates, none of whom had any legitimate QVC business, including: approximately $2,632.17 in private car rides for defendant FALKOWSKI's personal assistant F.E.; $1,558.41 in private car rides for F.E.'s sister M.F.; $2,741.81 in private car rides for defendant FALKOWSKI's romantic interest N.N., including for N.N.'s private car rides in Hawaii; and $4,319.57 in private car rides for defendant FALKOWSKI's friend C.S.

58. Starting in or about June 2013, defendant JAMES D. FALKOWSKI used deception to prevent other QVC employees from learning of his private luxury car usage.

59. In an email dated on or about June 30, 2013, to EmpireCLS's car booking agent K.F., defendant JAMES D. FALKOWSKI stated: "I need a car to pick me up at my office at 5:15 PM [. . . .] 1- [The driver] should NOT have anything in the window of the car with my name on it[;] 2- He should park in guest / visitor parking NOT in the front circle [at QVC].[;] 3- I need his phone number before he arrives so that I can call him and meet him in the visitor parking lot and not the front circle…. Can you please confirm this and make especially sure that he does not have a sign posted anywhere with my name on it[. . . .] Thanks, Jamie."

60. In an email dated on or about September 20, 2013, defendant JAMES D. FALKOWSKI emailed TSG staff stating: "I need a favor from you. I need a car from QVC to my home in Philly today [. . . .] I do not want my name in a window of a car or showing. It

needs to be discrete[. . . .]" M.S., TSG's president, responded via email, stating that the car was booked for defendant FALKOWSKI under the alias "Joe Smith."

**Fraudulent Kickback Arrangement With Domain Miami**

61. Starting in or about 2010, defendant JAMES D. FALKOWSKI told E.W. and M.S. that TSG could serve as a "vendor representative" for QVC, meaning TSG could bring celebrity-endorsed product to QVC, QVC would sell the product, and TSG would receive royalties from QVC for those sales.

62. Defendant JAMES D. FALKOWSKI became E.W.'s and M.S.'s secret "silent partner" in the deal, without QVC's knowledge or approval.

63. Defendant JAMES D. FALKOWSKI thereafter assisted E.W. and M.S. in negotiating against QVC – his own employer – by providing QVC's inside contractual information, which enabled E.W. and M.S. to obtain from QVC a larger royalty percentage over a longer period of time.

64. In return, E.W. and M.S. cut defendant JAMES D. FALKOWSKI into the deal and made him their secret partner, agreeing to pay him a kickback of fifty percent (50%) on all royalty payments received from QVC. TSG entered into this vendor representative deal with QVC under the name Domain Miami.

65. In or about January and February 2012, defendant JAMES D. FALKOWSKI, E.W., and M.S. entered into a separate deal with "TigerJ," a New York City-based apparel company. Pursuant to this deal, defendant FALKOWSKI, E.W., M.S., and TigerJ brought a handbag line promoted by celebrity G.R. to a QVC competitor.

66. After TigerJ's Chairman J.S. expressed concern that defendant JAMES D. FALKOWSKI, a QVC director, was secretly part of the deal involving a QVC competitor, E.W. emailed TigerJ's Chairman J.S., TigerJ's President M.L., and M.S. on or about February 27, 2012, stating: "[TigerJ's President M.L.] also voiced your concern about our internal structure with our silent partner [FALKOWSKI]. We spoke and are well aware of how we need to proceed in a very behind the scenes manner. Our partner will remain silent, and no one will ever hear of it again."

67. On or about September 25, 2012, after the QVC competitor sold approximately $1.8 million of the G.R. handbag line, M.S. sent an email to defendant JAMES D. FALKOWSKI, stating: "We need to write [TigerJ President M.L.] an email about payment [. . .] Can you and I call [M.L.] today xo[?]" Defendant FALKOWSKI responded that day via email: "Not while I am at the office."

68. E.W. sought to keep the partnership with defendant JAMES D. FALKOWSKI secret from the beginning.

69. In an email to defendant JAMES D. FALKOWSKI dated or about March 8, 2012, E.W. wrote: "[J.S.] needs to go over with you how we are going to approach the accounting. As you know we set up a separate company in FL just for paying our partner[. . . .] Please don't put details in email for now." In an email from E.W. to defendant FALKOWSKI, M.S. and J.S. dated on or about November 30, 2012, E.W. stated: "Jamie, As of today we have not received the check from [TigerJ]. I have the checks for domain Miami coming to the house to maintain privacy."

70. After QVC terminated defendant JAMES D. FALKOWSKI in December 2013, defendant FALKOWSKI, E.W., and M.S. feuded about money owed pursuant to their kickback arrangement.

71. On or about May 3, 2014, defendant JAMES D. FALKOWSKI emailed E.W., M.S. and J.S., stating: "Let's be clear of a few things: 1- The QVC and [TigerJ] revenue streams exist because of me solely. 2- You have a better deal [at QVC] than any other rep because of me solely. 3- we do not have any contract between us of our deal JUST [M.S.]'s word that we split things 50/50 always. This was because of the complications while I was at QVC."

72. On or about December 10, 2014, believing that TSG was withholding his kickback payments, defendant JAMES D. FALKOWSKI emailed E.W., M.S. and J.S., stating: "My next call is to QVC if you choose [. . . .] Please don't test me because [. . .] I can cause quite a few waves [. . . .] You have made tons of money because of me and I'm not going to be cut out of my portion with no answers." E.W. responded that day via email: "These are now serious threats[. . . .] Your threat to contact qvc is beyond common sense."

73. In total, Domain Miami received approximately $312,488.32 in royalty payments from QVC. Per the kickback arrangement, E.W. and M.S. paid defendant JAMES D. FALKOWSKI approximately $160,981.73 as his cut of the deal. A remaining amount of approximately $50,933.97 was held in escrow after QVC detected fraud.

**Fraudulent Kickback Arrangement With SPEC**

74. Starting in or about 2010, defendant JAMES D. FALKOWSKI told SPEC's president that SPEC could serve as a "vendor representative" for QVC, meaning SPEC

could bring celebrity-endorsed product to QVC, QVC would sell the product, and SPEC would receive royalties from QVC for those sales.

75. Defendant JAMES D. FALKOWSKI subsequently entered into a kickback deal with SPEC's President, without QVC's knowledge or approval, pursuant to which SPEC's President agreed to provide defendant FALKOWSKI with a fraudulent kickback of one-third (33%) of all royalty payments received from QVC. SPEC's President, in an effort to hide the kickback arrangement, refused to pay defendant FALKOWSKI's personal bank account directly for defendant FALKOWSKI's cut of the deal. Instead, SPEC's President instructed defendant FALKOWSKI to incorporate a business entity, so SPEC's President could pay the business entity, instead of defendant FALKOWSKI.

76. In or about 2013, defendant JAMES D. FALKOWSKI, with SPEC's President's assistance, incorporated "Brand & Talent West, Inc." ("B&TW"), thus permitting SPEC's President to pay defendant JAMES D. FALKOWSKI his share of the kickback arrangement. To further mask the nature of the payments, B&TW issued bogus invoices to SPEC, which SPEC then paid under the guise that defendant FALKOWSKI, through B&TW, had provided SPEC with "marketing consulting services."

77. In total, SPEC received approximately $314,786.92 in royalty payments from QVC. Per the kickback arrangement, from in or about October 2013 through in or about May 2016, SPEC's President paid defendant JAMES D. FALKOWSKI approximately $81,571.23. A remaining amount of approximately $54,057.61 was held in escrow after QVC detected fraud.

78. On or about the dates listed below, in the Eastern District of Pennsylvania, and elsewhere, defendant

**JAMES D. FALKOWSKI**
**a/k/a "Jamie Falkowski"**

for the purpose of executing the scheme described above, caused to be transmitted, by means of wire communications in interstate commerce, the signals and sounds described below:

| Count | Date (On or About) | Description of Wire |
|---|---|---|
| 1 | August 8, 2012 | Wire containing electronic data pertaining to deposited check #9901, totaling $8,254.26, drawn on Domain Miami's Bank of the West account ending in #1457, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865, the wire traveling from New York to Nebraska or California, and then on to Hawaii. |
| 2 | August 17, 2012 | Wire payment totaling approximately $29,303.96, sent by TSG's Bank of the West account ending in #0195, deposited into defendant FALKOWSKI's Bank of America account ending in #3865, the wire traveling from California to Hawaii. |
| 3 | September 25, 2012 | Email sent by defendant FALKOWSKI in Pennsylvania from his jamesfalkowski@gmail.com email account, to M.S. in California, in which defendant FALKOWSKI stated he could not make a phone call regarding financial matters pertaining to their kickback arrangement for product sold by a QVC competitor "while I am at the office." |
| 4 | October 19, 2012 | Wire payment totaling approximately $40,144.21, sent by TSG's Bank of the West account ending in #0195, deposited into defendant FALKOWSKI's Bank of America account ending in #3865, the wire traveling from California to Hawaii. |
| 5 | October 19, 2012 | Wire payment totaling approximately $50,000.00, sent by TSG's Bank of the West account ending in #0195, deposited into defendant FALKOWSKI's Bank of America account ending in #3865, the wire traveling from California to Hawaii. |

| **Count** | **Date (On or About)** | **Description of Wire** |
|---|---|---|
| 6 | March 26, 2013 | Email sent by SPEC employee J.P. in New York, to QVC personnel in Pennsylvania, cc'ing defendant FALKOWSKI and SPEC President, and attaching invoices that were falsified at defendant FALKOWSKI's direction. |
| 7 | May 10, 2013 | Wire payment totaling approximately $41,970.00, sent by Domain Miami's JP Morgan Chase account ending in #6380, deposited into defendant FALKOWSKI's Bank of America account ending in #3865, the wire traveling from Delaware to Florida. |
| 8 | September 20, 2013 | Multiple emails sent by defendant FALKOWSKI in Pennsylvania from his jamesfalkowski@gmail.com email account, to M.S., J.S. and others in California, in which defendant FALKOWSKI instructed TSG use deception when booking his private luxury chauffer service to ensure that other QVC employees would not know that defendant FALKOWSKI was using private luxury chauffeur service to ride from QVC's offices in West Chester, PA to his apartment in Philadelphia, PA. |
| 9 | November 6, 2013 | Wire payment totaling approximately $15,609.00, sent by Domain Miami's JP Morgan Chase account ending in #6380, deposited into defendant FALKOWSKI's Bank of America account ending in #3865, the wire traveling from Delaware to Florida. |
| 10 | February 25, 2014 | Wire payment totaling approximately $5,000.00, sent by Domain Miami's JP Morgan Chase account ending in #6380, deposited into defendant FALKOWSKI's Bank of America account ending in #3865, the wire traveling from Delaware to Florida. |
| 11 | May 5, 2014 | Wire payment totaling approximately $15,370.06, sent by Domain Miami's JP Morgan Chase account ending in #6380, deposited into defendant FALKOWSKI's Bank of America account ending in #3865, the wire traveling from Delaware to Florida. |

All in violation of Title 18, United States Code, Section 1343.

**COUNTS TWELVE THROUGH TWENTY-TWO**
**(Mail Fraud)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 8 of Counts One through Eleven's "Background" section are incorporated here.

**THE SCHEME**

2. From at least in or about September 2009, through at least in or about November 2013, defendant

**JAMES D. FALKOWSKI**
**a/k/a "Jamie Falkowski"**

devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

**MANNER AND MEANS**

3. Defendant JAMES D. FALKOWSKI engaged in a multi-layered fraud scheme that enabled him to live a life of luxury. Defendant FALKOWSKI deployed a variety of methods to fraudulently obtain at least over $1,000,000 worth of money, goods and services from his employer, QVC.

4. Paragraphs 3 through 77 of Counts One through Eleven's "Manner and Means" section are incorporated here.

5. As a QVC director, defendant JAMES D. FALKOWSKI had the ability to order any product sold by QVC, at QVC's expense, and have that product shipped, also at QVC's expense, to any person of defendant FALKOWSKI's choosing.

6. QVC maintained this product requisition process to permit its trusted high-level employees to provide samples of QVC products to industry influencers, fashion and entertainment writers and personalities, and the like, in order to further QVC's brand image and thereby provide value to QVC.

7. From in or about September 2009 through in or about November 2013, defendant JAMES D. FALKOWSKI fraudulently abused this process to shower his friends and associates with at least tens of thousands of dollars' worth of products at QVC's expense. In some instances, defendant FALKOWSKI's friends and associates provided defendant FALKOWSKI with "wish lists" containing thousands of dollars of products these people desired for themselves and others.

8. On or about the dates listed below, in the Eastern District of Pennsylvania, and elsewhere, defendant

**JAMES D. FALKOWSKI**
**a/k/a "Jamie Falkowski"**

for the purpose of executing the scheme described above, and attempting to do so, caused to be delivered by UPS, according to the directions thereon, the following items, each mailing constituting a separate count:

| Count | Date (On or About) | Description of Mailing |
|---|---|---|
| 12 | August 15, 2012 | Package containing an "Apple New iPad 32GB Capable and WiFi w/ Access" costing $875, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to A.B. in New York. |
| 13 | December 19, 2012 | Package containing a "Canon Rebel T4i DSLR 18MP Cameron w/ 2 Lenses, Bag & SD Card" costing $760, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to A.B. in New York. |

| **Count** | **Date (On or About)** | **Description of Mailing** |
|---|---|---|
| 14 | December 20, 2012 | Package containing a “PedicSolutions Majestic KG 3 [inches] Memory Foam Mattress Topper” costing $115.20, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to A.B. in New York. |
| 15 | December 20, 2012 | Package containing a “Nespresso Essenza Plus Espresso Late Cappucino System” costing $123.20, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to A.B. in New York. |
| 16 | December 21, 2012 | Packages containing a “Breville BJS600XL Juice Fountain Crush” costing $303.63, and a “Breville Die-Cast Juice Fountain Elite” costing $221.09, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to A.B. in New York. |
| 17 | December 21, 2012 | Package containing a “Bose SoundLink Wireless Mobile Speaker-LX w/Car Chrger & Cover Red” costing $220.77, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to A.B. in New York. |
| 18 | February 27, 2013 | Package containing a “Dyson DC41 Animal Ball Upright Vacuum” costing $352.58, and a “Dyson DC44 Animal Cordless Digital Slim w/ Mini” costing $273.99, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to SPEC’s President in New York. |
| 19 | February 28, 2013 | Package containing an “Apple 13.3 [inch] Macbook Air 256GB SSD, 4GB with App” costing $1,930.00, and an “Apple 15.4 [inch] Macbook Pro 500GB, 4GB with Apple T” costing $2,400.00, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to SPEC’s President in New York. |
| 20 | March 4, 2013 | Package containing a “Canon EOS 5D Mark III DSLR Camera w/ EF 24-105” costing $3,690.00, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to SPEC’s President in New York. |
| 21 | June 20, 2013 | Package containing twenty (20) “Sarah Potempa BEACHWAVER Rotating Curling Iron w/ Clips & Comb” costing $1,800, each item costing $90, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to M.B. in New York, who used the curling irons as gifts for her bridal party at her wedding. |

| Count | Date (On or About) | Description of Mailing |
|---|---|---|
| 22 | July 8, 2013 | Package containing an "Apple MacBook Pro 15.4 inches" costing $2,160, caused by defendant FALKOWSKI to be sent by QVC in Pennsylvania, via UPS, to L.W. in California, the computer being a gift from FALKOWSKI to J.B., the teenage daughter of A.B., for J.B.'s birthday. |

All in violation of Title 18, United States Code, Section 1341.

**COUNT TWENTY-THREE**
**(Conspiracy)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. From at least in or about 2010 through on or about May 14, 2014, in the Eastern District of Pennsylvania, and elsewhere, defendant

**JAMES D. FALKOWSKI**
**a/k/a "Jamie Falkowski"**

conspired and agreed, together and with others known and unknown to the grand jury, to commit offenses against the United States, that is, to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and to use the U.S. mails and wire transmissions in interstate commerce to further the scheme to defraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

**MANNER AND MEANS**

It was part of the conspiracy that:

2. Paragraphs 1 through 8 of Counts One through Eleven's "Background" section are incorporated here.

3. Defendant JAMES D. FALKOWSKI, along with other co-conspirators known and unknown to the grand jury, conspired to defraud QVC by engaging in a fraudulent kickback arrangement, pursuant to which defendant FALKOWSKI, without QVC's knowledge or approval, provided E.W. and M.S. with QVC's inside contractual information, which enabled E.W. and M.S. to obtain from QVC a larger royalty percentage over a longer period of time, in return for being cut into the deal as a secret partner.

4. E.W. and M.S. agreed to cut defendant JAMES D. FALKOWSKI into the

deal, to make him their secret "silent partner," and to pay defendant FALKOWSKI a kickback of fifty percent (50%) on all royalty payments received from QVC. TSG entered into this vendor representative deal with QVC under the name Domain Miami.

5. In or about January and February 2012, defendant JAMES D. FALKOWSKI, E.W., and M.S. also entered into a separate deal with "TigerJ," a New York City-based apparel company. Pursuant to this deal, defendant FALKOWSKI, E.W., M.S., and TigerJ brought a handbag line promoted by celebrity G.R. to a QVC competitor.

6. Paragraphs 61 through 73 of Counts One through Fifteen's "Manner and Means" section are incorporated here.

**OVERT ACTS**

In furtherance of the conspiracy, defendant JAMES D. FALKOWSKI, and others known and unknown to the grand jury, committed the following overt acts in the Eastern District of Pennsylvania, and elsewhere:

1. On or about January 9, 2011, defendant JAMES D. FALKOWSKI sent an email to M.S. in which defendant FALKOWSKI told M.S. how to negotiate against QVC in the vendor representative agreement negotiations, stating: "Here is what I would say…. You are looking for 4.5% of net retail for all designers and brands that you bring in."

2. After QVC's legal team sent an email to E.W. and M.S. on or about March 21, 2011, stating QVC's position on certain provisions – including holding firm on a 3% royalty, and requesting a "right of first refusal" – E.W. forwarded that email to defendant JAMES D. FALKOWSKI, stating: "Jamie, I can only assume that you know other deals and whether or not we should fight for this and what our appropriate response should be at this point."

3. Later that day, defendant JAMES D. FALKOWSKI responded to E.W. and M.S. via email, stating: "Push back on the 3 years… Say that you absolutely will not do a deal like that. Let's talk tomorrow."

4. After TigerJ's Chairman, J.S., expressed concern that defendant JAMES D. FALKOWSKI, a QVC director, was secretly part of the deal for involving a QVC competitor, E.W. emailed TigerJ Chairman J.S., TigerJ President M.L., and M.S. on or about February 27, 2012, stating to J.S.: "[TSG's President M.L.] also voiced your concern about our internal structure with our silent partner [FALKOWSKI]. We spoke and are well aware of how we need to proceed in a very behind the scenes manner. Our partner will remain silent, and no one will ever hear of it again."

5. On or about May 11, 2012, Domain Miami issued a check to defendant JAMES D. FALKOWSKI totaling approximately $21,653.40, drawn on Domain Miami's Bank of the West account ending in #1457, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

6. On or about August 8, 2012, Domain Miami issued a check to defendant JAMES D. FALKOWSKI totaling approximately $8,254.26, drawn on Domain Miami's Bank of the West account ending in #1457, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

7. On or about December 3, 2012, Domain Miami issued a check to defendant JAMES D. FALKOWSKI totaling approximately $7,258.58, drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

8. On or about December 6, 2012, Domain Miami issued a check to defendant JAMES D. FALKOWSKI totaling approximately $15,469.91, drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

9. On or about February 11, 2013, Domain Miami issued a check to defendant JAMES D. FALKOWSKI totaling approximately $2,451.37 drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

10. On or about February 19, 2013, Domain Miami issued a check to defendant JAMES D. FALKOWSKI totaling approximately $5,041.10, drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

11. On or about May 10, 2013, Domain Miami issued a wire transfer of funds to defendant JAMES D. FALKOWSKI totaling approximately $41,970.00, drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

12. On or about August 26, 2013, Domain Miami issued a check to defendant JAMES D. FALKOWSKI totaling approximately $22,903.55, drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his B&TW Bank of America account ending in #5384.

13. On or about November 6, 2013, Domain Miami issued a wire transfer of funds to defendant JAMES D. FALKOWSKI totaling approximately $15,609.50 drawn on

Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

14. On or about February 25, 2014, Domain Miami issued a wire transfer of funds to defendant JAMES D. FALKOWSKI totaling approximately $5,000 drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

15. On or about February 25, 2014, Domain Miami issued a wire transfer of funds to defendant JAMES D. FALKOWSKI totaling approximately $15,370.06 drawn on Domain Miami's JP Morgan Chase account ending in #6380, deposited by defendant FALKOWSKI into his Bank of America account ending in #3865.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1. As a result of the violations of Title 18, United States Code, Sections 1343, 1341, and 371, as set forth in this information, defendant

**JAMES D. FALKOWSKI**
**a/k/a "Jamie Falkowski"**

shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, that is wire fraud, mail fraud, or a conspiracy to commit such offenses.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c).

**A TRUE BILL:**

______________________________
**GRAND JURY FOREPERSON**

______________________________
**LOUIS D. LAPPEN**
**ACTING UNITED STATES ATTORNEY**